**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| STARK TRUSS COMPANY. INC., an Ohio Corporation, | ) ) ) | JUDGE: |
| Plaintiff, | ) ) | CASE NO: |
| v. | ) ) | **COMPLAINT** |
| AFFINITY ELMWOOD GATEWAY PROPERTIES, LLC, a New York Limited Liability Company, | ) ) ) ) | **(Jury Demand Endorsed Hereon)** |
| and | ) ) | |
| RP OAK HILL BUILDING COMPANY, INC., a New York Corporation, | ) ) ) | |
| and | ) ) | |
| MERCHANTS BONDING COMPANY (MUTUAL), An Iowa Corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

Stark Truss Company, Inc. ("Stark Truss"), for its Complaint against Affinity Elmwood Gateway Properties, LLC (the "Owner"), RP Oak Hill Building Company, Inc. (the "CM"), and Merchants Bonding Company (Mutual) (the "Surety"), alleges and states the following:

## THE PARTIES

1.      Stark Truss is a for-profit corporation organized under the laws of the State of Ohio that maintains its principal place of business in Canton, Ohio.

2.      The Owner is, on information and belief, a limited liability company organized under the laws of the State of New York.  Its members are, on information and belief, citizens of

1

New York and Florida.  For purposes of diversity jurisdiction, the Owner is a citizen of the States of New York and Florida.

3.      The CM is, on information and belief, a corporation organized under the laws of the State of New York that maintains its principal place of business in Buffalo, New York.

4.      The Surety is, on information and belief, a corporation organized under the laws of the State of Iowa that maintains its principal place of business in Des Moines, Iowa.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000.00 and there is complete diversity of citizenship between Stark Truss (citizen of Ohio) and the defendants (citizens of New York, Florida, and Iowa).

6.      This Court has general personal jurisdiction over the Owner as it has its principal place of business in New York.  The Court also has specific personal jurisdiction over the Owner because the construction project for which it contracted with Stark Truss is located in New York and the Owner's actions giving rise to this Complaint occurred in New York.

7.      This Court has general personal jurisdiction over the CM because its principal place of business is located in New York.  The Court also has specific personal jurisdiction over the CM because its actions giving rise to this Complaint occurred in New York.

8.      This Court has specific personal jurisdiction over the Surety because the bond it issued was to discharge a mechanics' lien filed against the construction project that is the subject of this dispute, which is located in New York.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in the district.  Further, the construction project at issue is located within this district.

## FACTS

### *Project Background*

10.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

11.     The Project (described further below) was for the construction of timber-framed luxury condominiums, consisting of a North and South building, located at 1111 Elmwood Ave., Buffalo, NY.

12.     On or about April 15, 2019, Stark Truss and the Owner entered into a contract (the "Contract") for the purposes carrying out the construction project known as Elmwood Ave. Condominiums (the "Project").  (A true and accurate copy of the Contract is attached as **Exhibit 1**.)

13.     Stark Truss's scope of work consisted of rough carpentry, wood wall panels, and wood roof and floor truss work, supplying engineered wood products and miscellaneous lumber, and attendant hoisting, framing, and labor.

14.     Stark Truss's original installation was to start on or about April 16, 2019; Stark Truss's original substantial completion date was scheduled for June 1, 2020.

15.     The Contract sum was $2,219,968.00, with a $690,357.00 allowance for engineered wood products and miscellaneous loose lumber and a $100,000.00 allowance for hoisting.

16.     The Owner contracted with the CM to provide administration of the Contract, to be the Owner's representative during construction, and to perform construction management duties and responsibilities.  The CM had authority to act on behalf of the Owner for the Project.

17.     The general sequence of work as determined by the CM began at the South Building with excavation, and then proceeding as follows:  foundations, underground utilities, masonry

shafts, structural steel erection and detailing, wood framing, roofing, exterior façade, interior framing, MEP rough-in, drywall work, and then finishes.

18.     The same general sequence of work was to commence at the North Building upon completion of structural steel at the South Building.

***The CM's Failures***

19.     The CM was to provide appropriate staffing at the Project to schedule and coordinate the work of Stark Truss and other contractors in accordance with the approved Project schedule.  Instead, however, the CM allowed the Project to become a revolving door for project managers, field engineers, and superintendents that failed to schedule the work to conform to the planned schedule, to various schedule updates, and to standard construction industry practices.

20.     For instance, the CM demanded Stark Truss commence its wood framing despite predecessor work not being complete, such as stair foundations, underground utilities, elevator and stair masonry shafts, and structural steel and decking.  In turn, that required much of Stark Truss's work to need temporary support by "false work" until the building structure was in place such that it could accept Stark Truss's work.

21.     Upon information and belief, the CM directed Stark Truss to commence its work despite the Project not being ready for such work so as to conceal its failures from the Owner.

22.     According to the schedule updates, the CM also re-sequenced work in an illogical fashion to, upon information and belief, make up for its other failures.  Specifically, the CM directed interior framing prior to having underground utilities and concrete finished; directed MEP rough-in and building insulation prior to finishing interior framing; and directed drywall installation prior to finishing masonry work.

23.     Further, the CM never created or maintained a Project schedule that logically tied the work activities together, identified the critical path, or depicted the full scope of the Project in its entirety.

24.     In addition to the CM's mismanaged schedule oversight and execution, the CM wrongly directed Stark Truss and others with respect to construction means and methods, which is prohibited by the Contract.

25.     Finally, the CM failed to follow the applicable contract documents, including the Contract, thereby waiving them.  For instance, the CM did direct and pay for extra and changed work without a fully executed change order.  (This extra and changed work is not the subject of this lawsuit, but it is relevant to show the CM's failure to follow the contract documents.)  As described further below, the CM also directed Stark Truss to bill its work different than the process set forth in the Contract.

26.     In addition to the CM's failures, the lead architect for the Project was also fired mid-Project.

27.     The events described in the foregoing paragraphs 19-26, along with the attendant delays, were (a) not reasonably contemplated at the time Stark Truss entered into the Contract; (b) so unreasonable that they constitute an intentional abandonment of the Contract by the Owner (through the CM's actions); and/or (c) the result of the Owner's breach (through the CM's actions) of fundamental obligations under the Contract, such as providing a schedule, a buildable design, and a competent design team.

28.     Over four years after commencement in August 2018 and nearly two-and-a-half years after the planned substantial completion, the Project still is not substantially complete.  This

is due to the incompetence and negligence of the CM and its inability to perform the duties and responsibilities of a construction manager.

### *Stark Truss's Extra and Changed Work*

29.     At all times, Stark Truss acted at the direction of the CM both in the field to perform extra and changed work and in its submission of pay applications.  As stated, the CM was in privity of contract with the Owner and, at all times, could act on the Owner's behalf.

30.     Stark Truss was directed to and did perform the following extra and changed work on the South Building:  structural revisions, revisions resulting from incomplete design and/or changed conditions, additional hoisting, out-of-sequence and re-sequenced work, temporary structures made necessary by other trades being behind schedule and/or work being directed out of sequence, and associated inefficiencies.

31.     Stark Truss was directed to and did perform the following extra and changed work on the North Building:  revisions resulting from incomplete design and/or changed conditions, additional hoisting, addition of Advantech Sheathing for the sub-floor, out-of-sequence and re-sequenced work, temporary structures made necessary by other trades being behind schedule and/or work being directed out of sequence, storefront design changes, cornice design changes, pilaster design changes, and associated inefficiencies.

32.     The Owner and CM were put on notice throughout the Project that Stark Truss was incurring additional costs and work delays due to the changed and extra work.

33.     On or about July 21, 2020, the CM (through its employee Chris Hogan) on behalf of the Owner, acknowledged Stark Truss's changed and extra work.  In addition to directing Stark Truss to perform the extra and changed work, the CM also directed Stark Truss how to bill for

such work.  Specifically, the CM directed Stark Truss to use the Contract allowances to fund the acknowledged extra and changed work.  This method of billing was not per the Contract.

34.     Upon information and belief, the CM gave Stark Truss this direction so as to induce Stark Truss's belief that it would in fact be paid for the changed and extra work.

35.     Stark Truss followed the CM's directives and reasonably relied upon its representations with respect to being paid for the extra and changed work and how to bill it.  In October, November, and December 2020, Stark Truss billed approximately $205,000.00 worth of extra and changed work against the Contract allowances.

36.     The CM and Owner funded extra and changed work, to a point, through the Contract allowances.  This is an express acknowledgement that Stark Truss did in fact perform extra and changed work, which was approved by the CM and the Owner.

37.     However, the Owner and CM have since refused to recognize the extra and changed work performed by Stark Truss and reneged on their agreement to pay for such work, whether out of the Contract allowances or otherwise.

38.     Upon information and belief, the CM intentionally, knowingly, and fraudulently induced Stark Truss to perform the extra and changed work but never had the intention that Stark Truss be paid for such work.

### *Project Delays*

39.     As a result of the extra and changed work and Project delays caused by others, Stark Truss spent an additional 395 days at the Project.

40.     Stark Truss commenced its work on April 16, 2019.  Significant predecessor work was not completed at that time, but it was represented to Stark Truss that such work would be completed in a manner that would not interfere with Stark Truss's work.

41.     Although the planned completion date for Stark Truss's work was June 1, 2020, Stark Truss was prevented from finishing its work until July 1, 2021, due to changed and extra work and attendant inefficiencies.  Stark Truss was not the cause of its delayed completion.

42.     These delays also forced Stark Truss to absorb the escalated cost of materials.  Had the Project been on schedule, Stark Truss could have fabricated its wall panels, roof trusses, and floor trusses when the materials were at a much lower value.

43.     In or around September 2020 (i.e., the middle of the Project), the lead architect on the Project was terminated.  The firing was not reasonably foreseeable to Stark Truss prior to entering into the Contract.  The firing also caused substantial delays.

44.     Delays caused by the architect involved, among others, design issues with the location and size of shafts, multiple defects and incomplete work as to windows throughout the Project, as well as a general pattern of poor communication, incomplete or defective work, and a lack of cooperation with others working on the Project.

45.     The delays described in paragraphs 39-44 were not contemplated by Stark Truss at the time it entered into the Contract and were otherwise unforeseeable by Stark Truss.

### *Stark Truss's Damages*

46.     As a result of the foregoing CM failures, extra and changed work, and delays, Stark Truss incurred additional costs to perform its work in the amount of $668,003.87, broken down as follows:  $89,282.44 for additional hoisting work; $241,163.67 for additional labor; $194,984.09 for material escalation; and $142,573.67 for Stark Truss's extended duration on the Project.

47.     Stark Truss is also owed retainage in the amount of $221,996.80.

48.     Stark Truss's compensatory damages total $890,000.67.

49.     As required by the Contract, the parties mediated this dispute on October 25, 2022, which continued into December 2022.  The parties have since reached an impasse.  As a result, all dispute resolution procedures set forth in the Contract have been exhausted.

## COUNT I
### (Breach of Contract against the Owner)

50.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

51.     The Contract represents the existence of a valid contract between Stark Truss and the Owner.

52.     Stark Truss fully performed its obligations under the Contract.

53.     Stark Truss was directed to and did perform extra and changed work not provided for in the Contract.  This extra and changed work was beyond Stark Truss's reasonable contemplation at the time it executed the Contract.

54.     The Owner and CM acknowledged Stark Truss's extra and changed work and had notice thereof.

55.     The CM, on the Owner's behalf, directed Stark Truss to use Contract allowances to fund the extra and changed work.

56.     In accordance with the Contract and the CM's directives, and by extension the Owner, Stark Truss applied for payment for the extra and changed work.  The extra and changed work was funded to a point but then reallocated to base contract work as explained in the following paragraphs.

57.     The Owner and CM reneged on their agreement to pay Stark Truss for its extra and changed work without justification and in breach of the Contract and their directives to Stark Truss.

58.     As a result of performing the extra and changed work, Stark Truss incurred additional costs and time, including costs for additional hoisting work, additional labor, escalated price of materials, and other costs related to delays on the Project caused by others.  Stark Truss has not been paid for this work.

59.     Beyond the additional costs incurred, Stark Truss is still owed retainage which the Owner has not paid.

60.     The Owner's failure to provide additional compensation for the acknowledged extra and changed work performed by Stark Truss constitutes a substantial and material breach of the Contract.

61.     Stark Truss is entitled to recover all of its additional costs associated with extra and changed work and Project delays, including prompt payment interest and other damages, as applicable.

62.     As a direct and proximate result of the Owner's material breaches of the Contract, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

## COUNT II
### (In the Alternative:  Quantum Meruit against the Owner)

63.      Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

64.     In the alternative to its cause of action for breach of contract, Stark Truss seeks quantum meruit compensation for the benefit it conferred upon the Owner through its performance of the extra and changed work.

65.     Stark Truss conferred a benefit upon the Owner by performing extra and changed work not expressly set forth in the Contract.

66.     Stark Truss performed the extra and changed work with the reasonable expectation that the Owner would provide it compensation for the same.

67.     The Owner and the CM had actual knowledge of and consented to Stark Truss's performance of the extra and changed work.

68.     The Owner and the CM voluntarily accepted the benefits conferred by Stark Truss's performance of the extra and changed work.

69.     Stark Truss performed the extra and changed work under circumstances which make it reasonable for Stark Truss to expect payment for such performance.

70.     The Owner has not fully paid Stark Truss for the extra and changed work.

71.     As a result of the Owner's failure to pay for the performance of the extra and changed work, and in the alternative to Stark Truss's breach of contract claim, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

## Count III
### (Claim on Lien Bond against the Surety)

72.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

73.     The above-described construction services performed by Stark Truss for the Project were performed and actually used for the construction of the Project.

74.     The above-described construction services performed by Stark Truss pursuant to the Contract were performed and furnished with the knowledge and consent of the Owner and the CM with the understanding that there would be payment therefore.

75.     The Owner and the CM consented to the labor, materials, and services supplied and/or furnished by Stark Truss in connection with the Project.

76.     On or about February 2, 2022, Stark Truss filed or caused to be filed in the Office of the Clerk of the County of Erie, State of New York, a Notice Under Mechanic's Lien Law against the Project in the amount of $443,320.56 for work performed by Stark Truss under the Contract (the "Project Lien").  A true and accurate copy of the Project Lien is attached as **Exhibit 2**.

77.     Said Project Lien set forth and stated, among other things:  (a) the name of the owner of the real property against whose interest therein a lien was claimed; (b) the nature of said interest; (c) the labor provided and materials furnished; (d) the agreed price and value of the labor provided and materials furnished; (e) date when the first labor was provided and first materials were furnished; (f) the date when the last labor was performed and materials were furnished; and (g) a description of the property sufficient for identification.

78.     Said Project Lien complied in all respects with the Lien Law of the State of New York governing services, filing, and acquiring of a mechanic's lien affecting private improvements.

79.     Upon information and belief, said Project Lien was duly docketed in the lien docket kept by the Clerk of the County of Erie for said purpose.

80.     Thereafter, a true copy of the Project Lien was duly served according to the requirements of Section 11 of the Lien Law of the State of New York.

81.     Pursuant to the Lien Law of the State of New York, an affidavit with proof of service of said Project Lien was filed with the Clerk of the County of Erie within the statutory period after the notice of lien was filed.

82.     Upon information and belief, no person not a party to this action has any interest in, or claim upon, the Project.

83.     At the time of filing of the Project Lien, there was justly due, owing, and unpaid by the Owner the amount of at least $443,320.56 plus interest.

84.     The Owner discharged the Project Lien by filing a bond (the "Lien Bond").  A true and accurate copy of the Lien Bond is attached hereto as **Exhibit 3**.

85.     The Surety issued the Lien Bond.

86.     Since the Owner filed the Lien Bond, the Surety has not issued payment to Stark Truss for the claims underlying the Project Lien or the Lien Bond.

87.     Stark Truss has not brought any action for the foreclosure of the Lien Bond, nor has Stark Truss been made a party to an action involving the Lien Bond.

88.     By virtue of the foregoing, Stark Truss is entitled to damages in an amount exceeding $443,320.56 to be proven at trial.

## COUNT IV
### (Fraud against the CM)

89.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

90.     Upon information and belief, the CM (through its employee Chris Hogan) intentionally, knowingly, and fraudulently represented that it intended to provide for payment to Stark Truss for the extra and changed work.

91.     Upon information and belief, the CM intentionally, knowingly, and fraudulently induced Stark Truss to perform the extra and changed work but never intended to pay for it.

92.     The CM's statement of intent to provide for the payment of Stark Truss for the extra and changed work it performed was material to Stark Truss's performing such work.

93.     The CM intentionally, knowingly, and fraudulently misrepresented its intent to perform consistent with its representation in an effort to mislead Stark Truss into believing and relying upon said performance of the CM.

94.     Stark Truss justifiably and reasonably relied upon the CM's representations with respect to its decision to perform the extra and changed work.

95.     As a direct and proximate result of the CM's fraud, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

<u>**COUNT V**</u>
**(Negligent Misrepresentation against the CM)**

96.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

97.     There existed on the Project a sufficient relationship between Stark Truss and the CM so as to be the functional equivalent of contractual privity.  In other words, Stark Truss and the CM were in a privity-like relationship based on their positions relative to the Project and based on the CM's course of conduct throughout the Project.

98.     Specifically, throughout the Project, the CM directed Stark Truss to perform extra and changed work and, along with such directives, represented that Stark Truss would be paid for such extra and changed work.

99.     The CM also directed Stark Truss how to bill for the extra and changed work, representing that if Stark Truss billed the work a certain way, it would be paid.

100.    The CM knew or should have known that Stark Truss desired the information supplied in the representation so as to be assured that it would receive payment for the extra and changed work it performed.

101.    The CM was aware that Stark Truss would rely on its representations of payment for extra and changed work.

102.    Stark Truss did in fact rely on the CM's representations of payment for extra and changed work.  Indeed, but for the CM's representations, Stark Truss would not have performed the extra and changed work.  At all times, Stark Truss's reliance on the CM's representations was reasonable.

103.    Stark Truss also followed the CM's directives with respect to billing for the extra and changed work.

104.    Based on Stark Truss's actions in response to the CM's directives and representations (i.e., following the CM's directives), the CM understood that Stark Truss was relying on the CM's representations of payment for extra and changed work.

105.    In fact, however, the CM did not intend to pay Stark Truss for the extra and changed work.

106.    As a direct and proximate result of the CM's conduct, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

## COUNT VI
### (In the Alternative:  Promissory Estoppel against the CM)

107.    Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

108.    The CM made a clear and unambiguous promise that it would provide for payment to Stark Truss for the extra and changed work it performed.

109.    The CM knew, or reasonably should have known, that Stark Truss could and/or would reasonably and foreseeably rely on the CM's promise to provide for payment for the extra and changed work performed.

15

110.     Stark Truss reasonably and actually relied on the CM's promise to provide for payment for the extra and changed work performed to its detriment.

111.     As a direct and proximate result of the CM's conduct, and in the alternative to Stark Truss's fraud claim, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

## COUNT VII
### (Negligence against the CM)

112.     Stark Truss incorporates by reference the preceding paragraphs as though fully rewritten herein.

113.     There existed on the Project a sufficient relationship between Stark Truss and the CM so as to be the functional equivalent of contractual privity.  In other words, Stark Truss and the CM were in a privity-like relationship based on their positions relative to the Project and based on the CM's course of conduct throughout the Project.

114.     The CM was to manage construction; to provide appropriate staffing at the Project; and to schedule and coordinate the work of Stark Truss and other contractors in accordance with the approved Project schedule.

115.     The CM owed Stark Truss a duty to perform its obligations described above in a fair and competent manner.

116.     The CM breached its duty to perform its obligations in a fair and competent manner.

117.     In particular, the CM allowed the Project to become a revolving door for project managers, field engineers, and superintendents that failed to schedule the work to conform to the planned schedule, to various schedule updates, and to standard construction industry practices.

118.     The CM also breached its duty to properly coordinate and sequence work.

119.    The CM also re-sequenced work to cover up its own mistakes, instead of sequencing the work in a manner that was logical, efficient, and in accordance with industry standards.

120.    The CM's breaches were the proximate cause and cause-in-fact of the damages suffered by Stark Truss, which include added costs to perform its work and Stark Truss's extended duration on the Project.

121.    As a direct and proximate result of the CM's conduct, Stark Truss has sustained damages in an amount to be determined at trial, and reasonably expected to exceed $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Stark Truss demands and prays for judgment as follows:

a.    As to Count I:  compensatory and expectancy damages in an amount to be proven at trial, plus prompt pay interest and other damages, reasonably expected to exceed $75,000.00;

b.    As to Count II:  in the alternative, the reasonable value of the extra and changed work which Stark Truss performed in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

c.    As to Count III:  compensatory and expectancy damages in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

d.    As to Count IV:  compensatory, consequential, and punitive damages in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

e.    As to Count V:  compensatory and consequential damages in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

f.  As to Count VI:  in the alternative, the reasonable value of the extra and changed work which Stark Truss performed in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

g.  As to Count VII:  compensatory and consequential damages in an amount to be proven at trial, and reasonably expected to exceed $75,000.00;

h.  Pre- and post-judgment interest; and

i.  Such other relief, both legal and equitable, as this Court deems just and proper, including attorneys' fees and the costs of this action.

Respectfully submitted,

*Jeffrey P. DiPalma*

Jeffrey P. DiPalma (NY Bar No. 518518)
THE LAW OFFICES OF JORDAN DIPALMA PLLC
235 East Main Street
Palmyra, New York 14522
jpd@jordandipalma.com
Telephone:  585.673.3053
Facsimile:  585.673.3054

and

Aaron S. Evenchik (Ohio Bar No. 0073809)
aevenchik@hahnlaw.com
*Admission Pro Hac Vice forthcoming*
Gregory A. Thompson (Ohio Bar No. 0089297)
gthompson@hahnlaw.com
*Admission Pro Hac Vice forthcoming*
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Telephone:  216.621.0150
Facsimile:  216.241.2824

*Attorneys for Plaintiff*
*Stark Truss Company, Inc.*

18

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P 38, Stark Truss hereby demands a trial by jury on all issues so triable.

*Jeffrey P. DiPalma*

*One of the Attorneys for Plaintiff*
*Stark Truss Company, Inc.*